# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D20-2147
_____

SHOWNTAIL THE LEGEND, LLC,

Petitioner,

v.

STATE OF FLORIDA DEPARTMENT
OF BUSINESS AND PROFESSIONAL
REGULATION,

Respondent.

_____

Petition for Review of Non-Final Agency Action—Original
Jurisdiction.

September 14, 2020

ON DENIAL OF MOTION FOR STAY

PER CURIAM.

The State Department of Business and Professional
Regulation suspended Petitioner's alcoholic beverage license on an
emergency basis, for Petitioner's failure to comply with Florida's
COVID-19 emergency orders. Petitioner sought review, and moved
to stay the order suspending its license. The motion to stay argued
there was an insufficient factual basis for the suspension order and
that Petitioner would suffer serious economic hardship from the
suspension. A writs and motions panel was assigned to review the
motion only, not the ultimate merits of the petition. The panel

majority denied the motion to stay in an unpublished order dated July 31, 2020, with a notation that the third member of the panel would issue a dissent.

We now note our colleague's dissent, although we do not agree with it and find that it addresses issues not properly before the Court, as they were not raised in either the motion to stay or the merits petition. *See Rosier v. State*, 276 So. 3d 403, 406 (Fla. 1st DCA 2019) (en banc) ("An appellate court is 'not at liberty to address issues that were not raised by the parties.' . . . Nor may an appellate court 'depart from its dispassionate role and become an advocate by second guessing counsel and advancing for him theories and defenses which counsel either intentionally or unintentionally has chosen not to mention.'") (citations omitted); *see also Atl. Coast Line Ry. Co. v. State Bd. of Equalizers*, 94 So. 681, 682–85 (Fla. 1922) (emphasizing fundamental premise that laws are presumptively constitutional unless and until the courts declare otherwise, and must be obeyed, failing which legal consequences will follow); *Gillyard v. Delta Health Grp.*, 757 So. 2d 601 (Fla. 5th DCA 2000) (approving proposition that "A governor's executive order is not a law, but it has the force and effect of law. It is issued pursuant to a State statute."); *Abramson v. DeSantis*, SC20-646, 2020 WL 3464376, at *1 (Fla. June 25, 2020) ("[A] pandemic is a 'natural emergency' within the meaning of section 252.34(8) [Fla. Stat.]. Accordingly, we further conclude that, under section 252.36(1)(b), the Governor has the authority to issue executive orders to address a pandemic in accordance with the Act.").

KELSEY and M.K. THOMAS, JJ., concur; TANENBAUM, J., dissents with opinion.

TANENBAUM, J., dissenting.

The Department of Business and Professional Regulation ("DBPR"), on an emergency basis and without a hearing, suspended the alcoholic beverage license it issued to Showntail the Legend, LLC ("STL"). STL promptly asked that we stay the suspension while it awaited disposition of its original petition challenging the precipitous agency action. DBPR opposed the stay.

2

The panel majority denied the stay in a previous, unpublished order, and I dissented. Now, I write to explain why.

I.

First, some background. In early March of this year, Florida's surgeon general declared the spread of the novel coronavirus (COVID-19) to be a public health emergency. *See* Order of Dr. Scott A. Rivkees (Dep't of Health March 1, 2020);[1] *see also* § 381.00315(1)(c), Fla. Stat. (2019) (defining "[p]ublic health emergency" as "any occurrence, or threat thereof, whether natural or manmade, which results or may result in substantial injury or harm to the public health from [among other things] infectious disease"); § 381.00315, Fla. Stat. (tasking state surgeon general, as state health officer, with the responsibility "for declaring public health emergencies, issuing public health advisories, and ordering isolation or quarantines"). The Governor followed suit and declared his own state of emergency under authority granted to him by section 252.36, Florida Statutes, ostensibly based on his conclusion that the Legislature's definition of a "natural emergency" includes "infectious disease," a term found in the just-quoted, separate definition of "public health emergency." *Compare* § 252.34(8), Fla. Stat. (2019) (defining "[n]atural emergency" to mean one "caused by a natural event, including, but not limited to, a hurricane, a storm, a flood, severe wave action, a drought, or an earthquake"), *with* § 381.00315(1)(c), Fla. Stat.

Initially, the Governor ordered all licensed alcoholic beverage vendors to suspend sales of those beverages for consumption on premises. *See* Executive Order 20-71 (Exec. Off. of the Gov. March 20, 2020); *see also* § 252.36(5)(h), Fla. Stat. (2019) (including in the Governor's emergency powers the power to "[s]uspend or limit the sale, dispensing, or transportation of alcoholic beverages"). In late April, as part of an effort to promote economic recovery among businesses that strained under the yoke of a statewide shutdown, the Governor allowed the sale of alcohol for consumption on premises, under certain restrictions, by those licensees that were restaurants and other food establishments and by those licensees

_____

[1]https://www.flgov.com/wp-content/uploads/covid19/DOH%20 declaration-of-public-health-emergency-covid-19-3.1.20.pdf

that did not derive more than half of their revenue from sales of alcoholic beverages. Executive Order 20-112 (Exec. Off. of the Gov. April 29, 2020). At the beginning of June, the Governor eased up even further, allowing bars and other licensed alcoholic beverage vendors that derived a majority of their revenue from alcoholic beverage sales to get in on the recovery action, again with certain restrictions. Executive Order 20-139 (Exec. Off. of the Gov. June 3, 2020). This allowance did not include nightclubs.

Alas, for bar owners and other alcoholic beverage vendors, it was not to last. At the end of June, DBPR issued an emergency order that prohibited a licensee from selling alcoholic beverage for on-premises consumption if the licensee derived "more than 50% of gross revenue from such sales." *See* Emergency Order No. 2020-09, at 2 (Dep't of Bus. & Prof'l Reg. June 26, 2020). According to DBPR, there was an increase of COVID-19-positive tests in Florida in the month of June, "and *some* of these cases involving younger individuals are *suspected* to have originated from visits to bars, pubs, or nightclubs." *Id.* (emphasis supplied). DBPR allowed restaurants and other food-service establishments to continue selling alcoholic beverages for on-premises consumption as long as such beverage sales made up 50 percent or less of their gross revenue. *Id.* at 3. A week later, DBPR amended that order to remove the revenue threshold but to limit the sale of alcoholic beverages for on-premises consumption to those licensees "also licensed to offer food service." Am. Emergency Order No. 2020-09, at 2 (Dep't of Bus. & Prof'l Reg. July 1, 2020).

II.

Any consideration of whether to suspend a license, or whether to stay a suspension pending a hearing, should proceed from the following indisputable premise: "Property rights are among the basic substantive rights expressly protected by the Florida Constitution." *Dep't of Law Enforcement v. Real Prop.*, 588 So. 2d 957, 964 (Fla. 1991). Indeed, that protection is a principal reason individuals form governments in the first place. John Locke thought so. *See, e.g.*, JOHN LOCKE, SECOND TREATISE OF GOVERNMENT § 138, at 73 (C.B. Macpherson ed., Hackett Publ'g Co. 1980) (1690) ("The *supreme power cannot take* from any man any part of his *property* without his own consent: for the

4

preservation of property being the end of government . . . ."). The Framers thought so too. *See, e.g.*, THE FEDERALIST No. 10, at 130–31 (James Madison) (Benjamin Wright ed., 1961) ("The protection of [the faculties from which the rights of property originate] is the first object of government."). And the die is cast at the beginning of our state constitution: "All natural persons" have, among other "inalienable rights," the right "to be rewarded for industry" and the right "to acquire, possess and protect property." Art. I, § 2, Fla. Const. (titled, "Basic rights").

The emergency suspension of a license implicates a property interest and these inalienable rights. *Cf. Robinson v. Fla. Bd. of Dentistry*, 447 So. 2d 930, 932 (Fla. 3d DCA 1984) (reminding "Department of Professional Regulation, as well as the specific professional boards coming under its purview . . . that the suspension of a license which is essential in the pursuit of livelihood involves state action" and requires due process).[2] "Once licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood," and due process guarantees provide "constitutional restraints [that] limit state power to terminate" them. *Bradsheer v. Fla. Dep't of Highway Safety & Motor Vehicles*, 20 So. 3d 915, 919 (Fla. 1st DCA 2009) (quoting *Bell v. Burson*, 402 U.S. 535, 539 (1971)); *see Wisconsin v. Constantineau*, 400 U.S. 433, 436 (1971) (explaining that "extremely broad" state police powers over alcohol still do not override the right to due process; noting significance in "most of the provisions of the Bill of Rights [being] procedural, for it is

---

[2] "A property interest may be created by statute, ordinance or contract," and once acquired, the individual is entitled to protection of that interest through due process. *Moser v. Barron Chase Sec., Inc.*, 783 So. 2d 231, 236 n.5 (Fla. 2001) (quotation and citation omitted). Even when the State is dealing with a privilege, which it has no obligation to grant, "after having chosen to extend it, the state may not withdraw that right on grounds of misconduct absent fundamentally fair procedures to determine whether the misconduct occurred." *Lankheim v. Fla. Atl. Univ., Bd. of Trs.*, 992 So. 2d 828, 834 (Fla. 4th DCA 2008) (citing *Goss v. Lopez,* 419 U.S. 565, 574 (1975)).

procedure that marks much of the difference between rule by law and rule by fiat").

The Legislature, meanwhile, vouchsafed to the public the ability to pool capital with others in the form of a limited liability company ("LLC") to advance business purposes, to seek a profit, and to make a living. *See generally* ch. 605, Fla. Stat. (2019) ("Florida Revised Limited Liability Company Act"). The members of STL took advantage of this privilege when they created their LLC. Bound up in the property of STL are the property interests of those members. *Cf. Pembina Consol. Silver Mining & Milling Co. v. Pennsylvania*, 125 U.S. 181, 189 (1888) (noting that corporations are entitled protection under the Fourteenth Amendment because they "are merely associations of individuals united for a special purpose, and permitted to do business under a particular name, and have a succession of members without dissolution"); *id.* ("The great object of a corporation is to bestow the character and properties of individuality on a collective and changing body of men." (internal quotation omitted)).

The members of STL no doubt applied and paid for an alcoholic beverage license in anticipation of putting it to use as part of their profit-making venture. *Cf.* § 561.19(5), Fla. Stat. (2019) (describing issuance of license upon approval of application and payment of license taxes and fees, including $10,750 fee for new liquor licenses); § 565.02, Fla. Stat. (2019) (listing various annual license fees). According to STL, its alcoholic beverage license is integral to its business model; the inability to sell alcohol on its premises has been terribly detrimental to its continued business operations (including an estimated $500,000 loss in sales). Bound up in that license, then, is the constitutional right of STL's individual members to acquire property and be rewarded for their industry.

DBPR, however, decided that alcoholic beverage license holders that were unlicensed to sell food, like STL, had to shut down or simply not use that license. That meant STL would have to dramatically and immediately change its business model, or shut down, simply because it held the wrong alcoholic beverage license. The merits of STL's resistance to, and persistent failure to comply with, DBPR's orders were not before our panel. The only

6

question before us was whether STL was entitled to a stay while it litigated the merits of DBPR's actions. As I highlighted just above in my quotation of DBPR's emergency order, and as I will discuss further below, DBPR asked us to withhold the stay for STL based entirely on conjecture and suspicion about the public health effects of COVID-19. It did not present specific, concrete facts that showed a probable danger flowing directly from granting STL a stay. We should not withhold the statutorily guaranteed stay from a licensee—designed to protect against unilateral interference with a fundamental right by a state agency without a hearing—when an agency rests on such a slender reed.

## III.

Indeed, we would do well to keep these property interests in mind when we consider the administrative state's opposition to stays like the one that STL sought. Florida law, in fact, entitles a petitioner like STL to a stay as a matter of right in almost all circumstances. *See* § 120.68(3), Fla. Stat. (2019). The exception to that entitlement is if, upon request from an agency, *we* (and not anyone else) "*determine*[] that a [stay] would constitute a probable danger to the health, safety, or welfare of the state." *Id.* (emphasis supplied). To be sure, an agency bears the burden "to present *to the court* sufficient documentation" showing that a stay poses a probable danger to the state. *Iturralade v. Dep't of Prof'l Regulation*, 482 So. 2d 375, 376 (Fla. 1st DCA 1985). I highlight the word "determine," though, because the statute requires that, before we refuse a stay to a licensee, we must do more than simply review whether an agency has made some showing of probable danger. Use of the verb "determine" reserves for the court a much more active role. It means that we exercise our own independent judgment in the matter; we must reason for ourselves as to whether the stay would pose a probable danger, based on the documentation or facts presented. That is to say, before we can deny a stay and allow an agency to continue its suspension of a Florida citizen's livelihood without a hearing, *we ourselves* must be able to make an independent and "logical inference of immediacy" from what the agency submits. *Old Timers Rest. & Lounge, Inc. v. Div. of Alcoholic Beverages & Tobacco*, 483 So. 2d 463, 464 (Fla. 1st DCA 1986).

We of course do not defer to the agency's assertions about what it means to be a "probable danger." *Cf.* Art. V, § 21, Fla. Const. (precluding a state court from deferring "to an administrative agency's interpretation of [a] statute or rule" and requiring the court to "interpret such statute or rule de novo"). More than that, we should not defer to an agency's assertions that there is in fact some probable danger to flow from a stay. The agency created the exigency by terminating a property interest—immediately and without a hearing. The Legislature, through section 120.68, chose to put the court between the licensee and the agency in an unusually direct way to ensure that only in the most *concretely* exigent circumstances would the termination of a property interest be allowed to persist without a hearing.

The court, then, should demand from an agency specific and documented facts from which we, ourselves, can cleanly infer the probable danger immediately flowing from the stay. There must be "sufficiently identif[ied] particularized facts" from which we can determine a probable danger, and the burden rests with the agency to document those specific facts. *Crudele v. Nelson*, 698 So. 2d 879, 880 (Fla. 1st DCA 1997) (quoting *Witmer v. Dep't of Bus. & Prof'l Regulation*, 631 So. 2d 338, 341 (Fla. 4th DCA 1994)); *cf. Am. Ins. Ass'n v. Fla. Dep't of Ins.*, 646 So. 2d 784, 788 (Fla. 1st DCA 1994) (rejecting "conclusory findings" that are not "factually explicit"); *Anderson v. Dep't of Health & Rehab. Servs.*, 482 So. 2d 491, 500 (Fla. 1st DCA 1986), *decision clarified on reh'g*, 485 So. 2d 849, 854 (Fla. 1st DCA 1986) (requiring specific facts establishing a likelihood of *immediate* harm to children); *Premier Travel Int'l, Inc. v. Fla. Dep't of Agric. & Consumer Servs.*, 849 So. 2d 1132, 1136 (Fla. 1st DCA 2003) (requiring specific facts that demonstrate a "level of urgency" regarding harm to seniors). An agency's "[g]eneral conclusory predictions of harm are not sufficient." *Daube v. Dep't of Health*, 897 So. 2d 493, 495 (Fla. 1st DCA 2005). Hyperbole and breathless statements should not carry the day.

Insisting on specific facts is especially critical in a case like this one, where DBPR's assertion of probable harm had nothing to do with the regulation of alcoholic beverages, but instead was based on newly developed, still-under-review public health theories. The Legislature tasked the state surgeon general, not DBPR, with the responsibility "for declaring public health

8

emergencies, issuing public health advisories, and ordering isolation or quarantines." § 381.00315, Fla. Stat. The Legislature also provided that, based on such a declaration, the state surgeon general, not DBPR, "may take actions that are necessary to protect the public health." *Id.*[3] Finally, not DBPR but the Department of Health, headed by the state surgeon general, "has the duty and the authority to declare, enforce, modify, and abolish the isolation and quarantine of persons, animals, and premises as the circumstances indicate for controlling communicable diseases or providing protection from unsafe conditions that pose a threat to public health." § 381.00315(4), Fla. Stat.; *see also* § 381.00315(1)(d), Fla. Stat. (defining "[q]uarantine" to mean "the separation of an individual reasonably believed to have been exposed to a communicable disease, but who is not yet ill, from individuals who have not been so exposed, to prevent the possible spread of the disease").

Moreover, the existence of a public health emergency should not excuse DBPR—or any other agency besides the Department of Health—from having to assert specific facts, based on its own expertise, that demonstrate a clear and emergent need to deny a stay. In other words, we should not just take DBPR's word for it in determining probable danger when the underlying suspension has stemmed from a public health matter rather than a regulatory matter. That, however, essentially was what DBPR asked us to do in opposing the stay, asserting that it and the Governor "would not

---

[3] Those legislatively authorized actions, to be taken by the state surgeon general—and not DBPR—include the following extraordinary steps:

> Ordering an individual to be examined, tested, vaccinated, treated, isolated, or quarantined for communicable diseases that have significant morbidity or mortality and present a severe danger to public health. Individuals who are unable or unwilling to be examined, tested, vaccinated, or treated for reasons of health, religion, or conscience may be subjected to isolation or quarantine.

§ 381.00315(1)(c)4., Fla. Stat.

issue Executive and Emergency Orders absent an understanding that COVID spreads easily in bars and nightclubs."

Putting aside DBPR's overwrought characterizations of STL's claim for a stay as "ludicrous," "fl[ying] in the face of scientific evidence and common sense," and "shirk[ing] public safety measures in the name of profit," it bears noting that the suspension order itself did not seem so sure about the connection between bars and spread. DBPR's suspension order stated that its emergency orders issued based merely on a *suspicion* that *some* cases of "younger individuals" testing positive originated from bars that were not observing safety protocols. Rather than rely on specific evidence of actual harm (say, COVID-positive cases traced back to STL), DBPR merely pointed us to three articles found on the internet.

The first was a published Japanese study that can be found on the website maintained by the Centers for Disease Control and Prevention ("CDC"). *See* Yuki Furuse et al., *Clusters of Coronavirus Disease in Communities, Japan, January–April 2020*, 26 EMERGING INFECTIOUS DISEASES 2176 (Sept. 2020).[4] The authors "analyzed 61 COVID-19 clusters among various communities in Japan and identified 22 probable primary cases that might have contributed to the disease incidence in clusters" during the specified period. *Id.* at 2176. The relevance was hard to glean. The main conclusion of the study was slightly different than what DBPR cited the article for: "We found that healthcare facilities, such as hospitals, and care facilities, such as nursing homes, were the primary sources of clusters, some of which had >100 cases." *Id.* at 2177. It was true that twenty-eight of sixty-one community clusters in the study came from healthcare, nursing home, and daycare facilities, followed by ten from restaurants *and* bars. *Id.* at 2176. However, "[t]he largest non-healthcare-related cluster we observed was among >30 persons who attended a live music concert, including performers, audience members, and event staff." *Id.* at 2177. DBPR failed to explain how this study of Japanese clusters could tell us anything about bars, as opposed to restaurants, being a significant source of COVID-19 spread in

---

[4] https://wwwnc.cdc.gov/eid/article/26/9/20-2272_article.

10

Florida. DBPR also failed to address the limitations acknowledged in the study itself: reliance on "voluntary cooperation," inability of some "case-patients" to disclose their contact history, "[r]ecall bias," and unavailability of data like "the number of persons present in the places where clusters of cases were detected." *Id.* at 2178.

DBPR's other two internet articles did not tell us much more that might be relevant to our determination. One was an online article from *Business Insider*, which promised to tell the reader, "Here are seven good reasons why science suggests that sipping a brew *outside* this weekend is a far better idea than bellying up to a bar indoors." Hilary Brueck, *Fauci says being 'at a bar, inside, is bad news' during the coronavirus pandemic. Here are 7 reasons why he's right, according to science.*, BUSINESS INSIDER (July 2, 2020).[5] None of the reasons[6] distinguished between a bar serving alcohol and a restaurant doing the same. The same was true of the third article cited by DBPR for support, which also resided on the CDC's website. *See Considerations for Restaurants and Bars*, CDC.GOV (July 17, 2020).[7] The article presumed the reopening of restaurants *and* bars. It identified risks that were applicable to both restaurants and bars, noting an increase in risk of COVID-19 spread "in a restaurant or bar setting" when there was indoor

---

[5] https://www.businessinsider.com/why-bars-are-so-dangerous-for-spreading-the-coronavirus-2020-7.

[6] The reasons included gems like these: "The coronavirus thrives, survives, and moves quickly indoors"; "Summertime sunlight can kill off a lot of virus, but there's little to no sun in a bar"; "Taking off a mask (which you need to do to drink) ups a person's risk of infection" (which also happens to be true for anyone who wants to eat indoors); "After a drink or two (or more), physical distancing and other forms of self-restraint might begin to disappear"; and "Most bar workers don't have sick pay, making it harder to stay home if they get symptoms."

[7] https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/business-employers/bars-restaurants.html.

seating on-site, and even more risk if seating capacity was not reduced and tables were not properly spaced.

Simply put, DBPR offered nothing from which we logically could infer that bars and other non-restaurant licensees selling alcohol on premises—that is, staying open for business at all—posed a probable danger, while restaurant licensees selling alcohol on premises did not. DBPR certainly did not assert any specific facts to demonstrate how an otherwise recalcitrant STL individually posed a particularly probable danger to the public health unless its alcohol license was shut down immediately without a hearing. Instead, DBPR asked that the stay be denied based on some generally applicable, working theory, rather than on specific facts—stating that "during the current pandemic, the public is gravely harmed not only by knowingly contracting this deadly disease but also by *potentially* being exposed to it" and that there was a "very real *possibility* that carriers of COVID are known to be asymptomatic [such that] any number of their staff and patrons . . . *may* well be COVID carriers who unknowingly infect others." (emphasis supplied). This was not enough from which to make a "logical inference of immediacy" that could support denial of a stay to STL.

How this court previously distinguished between the denial of a stay to a doctor and other situations bolsters my point. We once observed, "When a doctor has been found guilty of numerous incidents of malpractice, it logically follows that his continued practice of medicine would pose immediate danger to the health, safety and welfare of the public." *Old Timers*, 483 So. 2d at 464. Under those circumstances, we easily would deny the stay. "The same logical inference of immediacy does not flow from the fact that a licensed business has been operating under the control of an undisclosed third party and the business failed to have the requisite number of chairs available for dining required for its special license . . . ." *Id.*; *cf. Daube*, 897 So. 2d at 495 ("However, the emergency order did not allege that any of petitioner's patients were harmed or suffered an adverse outcome or injury caused by the unapproved product."); *see also Premier Travel Intern.*, 849 So. 2d at 1136 (determining that allegations were not explicit enough to make out a specific risk that would "demonstrate the level of urgency" necessary to support an emergency order); *Am. Ins. Ass'n*,

646 So. 2d at 788 (determining that an emergency order improperly relied on "conclusory findings" that were not "factually explicit" and did not "justify summary action based on an emergency or an immediate danger to the public health, safety or welfare" (citation omitted)).

DBPR's conclusory statements and citations to internet articles did not provide us a level of particularity from which we could logically infer a sense of immediacy and probable danger, so STL had a right to a stay.

IV.

Presumably, with the capital contributed by STL's members, STL obtained from DBPR a Series 4COP Dual Quota alcoholic beverage license. STL may not have had a right to obtain that license (after all, selling alcohol in Florida is a closely regulated privilege), but once DBPR granted the license, STL held a property interest in it. The livelihood of STL's members (not to mention STL's employees) seemingly depended on it. DBPR took that property interest away, before STL had an opportunity for a hearing. The Legislature granted STL a right to put that deprivation on hold while it litigated the merits of DBPR's suspension. Given the significance of this property interest, we should not countenance the use of a public health emergency as a substitute for actual, concrete facts, specific to the licensee's situation, from which we can determine a probable danger. DBPR did not demonstrate how any actual injury or harm was likely to flow from STL holding onto its license pending a hearing. And it failed to show how STL's provision of alcoholic beverages indoors posed more of a danger than that posed by restaurants DBPR had allowed to continue selling alcohol on premises. In turn, I voted to grant the stay, and I dissented from the majority's denial of it.

_____

John W. Roberts of Law Offices of John W. Roberts, PLLC, Miramar Beach, for Petitioner.

Joseph Yauger Whealdon, III, Tallahassee, for Respondent.